# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NYU LANGONE HOSPITALS,

                         Plaintiff,

       -against-

UNITEDHEALTHCARE INSURANCE
COMPANY, UNITEDHEALTHCARE OF NEW
YORK, INC.; and OXFORD HEALTH PLANS
(NY), INC.,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SUMMONS**

Index No.

Date Index No. Purchased:

**TO THE ABOVE-NAMED DEFENDANT**:

       **YOU ARE HEREBY SUMMONED**, to answer the Complaint in this action and to serve a copy of your answer, or, if the Complaint is not served with this Summons, to serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the service of this Summons, exclusive of the day of service (or within thirty (30) days after service is complete if this Summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

       This action is brought in the County of New York because Plaintiff's principal place of business is in New York County, and because New York County is the county in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

Dated: Great Neck, New York
        May 3, 2024

                                GARFUNKEL WILD, P.C.
                                *Attorneys for Plaintiff*

                                By:            */s/ Andrew L. Zwerling*
                                    Andrew L. Zwerling

4859-4176-1467v.1

Joshua M. Zarcone

111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200

TO:    UnitedHealthcare Insurance Company
185 Asylum Street
Hartford, Connecticut 06103.

UnitedHealthcare of New York, Inc.
111 8th Avenue
New York, New York 10011.

Oxford Health Plans (NY), Inc.
One Penn Plaza, 8th Floor
New York, New York 10119

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NYU LANGONE HOSPITALS,

               Plaintiff,

   -against-

UNITEDHEALTHCARE INSURANCE
COMPANY, UNITEDHEALTHCARE OF NEW
YORK, INC.; and OXFORD HEALTH PLANS
(NY), INC.,

               Defendants.

**COMPLAINT**

Index No.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff NYU Langone Hospitals ("NYU"), by its attorneys, Garfunkel Wild, P.C., hereby alleges for its Complaint against Defendants UnitedHealthcare Insurance Company ("UHC"), UnitedHealthcare of New York, Inc. ("UHC-NY"), and Oxford Health Plans (NY), Inc. ("Oxford")[1] as follows:

## INTRODUCTION

1.    This is a breach of contract action by which NYU seeks to recover millions of dollars owed for critical health care services rendered to Defendants' insured members.

2.    This action stems from Defendants' longstanding underpayment of NYU for outpatient prescription drugs provided to members of Defendants' Medicare Advantage benefit plans – specifically drugs covered by a federal program designed to reduce drug costs and enable hospitals to provide care to underserved populations.

---

[1]    UHC and UHC-NY are collectively referred to herein as "United."
UHC, UHC-NY, and Oxford are collectively referred to herein as "Defendants."
NYU and Defendants are collectively referred to herein as the "Parties," with each individually a "Party."

1

4887-6047-0703v.3

3.      There is no dispute that NYU rightfully provided health care services to patients under its contracts with Defendants, and is entitled to reimbursement for such services.  Still, Defendants refuse to remedy nearly five years' worth of obvious underpayments to NYU – instead clinging to a payment methodology held to be *unlawful* by the Supreme Court of the United States.

4.      Defendants' wrongful conduct has inflicted significant financial harm, depriving NYU of contractually-earned reimbursement to the tune of over four million dollars.

5.      Having exhausted all avenues to resolve this dispute amicably, NYU now brings this action seeking recovery from Defendants for breach of contract, unjust enrichment, and/or *quantum meruit*, plus statutory interest.

## THE PARTIES

6.      NYU is a nationally-recognized, full-service, academic health system headquartered in Manhattan.  Through its broad network of hospital campuses and outpatient facilities, NYU provides comprehensive, science-driven care to its local communities, and is one of the most critical tertiary care providers in the greater New York City area.

7.      As a critical care provider serving large volumes of low-income, uninsured, and/or underinsured patients, along with many Medicare and Medicaid beneficiaries, NYU participates in the federal 340B Drug Pricing Program (*see* ¶¶ 17-23, *infra*).

8.      NYU is a New York not-for-profit corporation with its principal place of business at 550 First Avenue, New York, New York 10016.

9.      Defendant UHC is a Connecticut corporation with its principal place of business at 185 Asylum Street, Hartford, Connecticut 06103.

10.     Defendant UHC-NY is a New York corporation with its principal place of business at 111 8th Avenue, New York, New York 10011.

11.     Defendant Oxford is a New York corporation with its principal place of business at

2

Case 1:24-cv-04803-PKC Document 1-1 Filed 06/24/24 Page 6 of 71

One Penn Plaza, 8th Floor, New York, New York 10119.

12.     Both UHC-NY and Oxford are subsidiaries and/or corporate affiliates of UHC through common ownership by UnitedHealth Group, Inc., a Minnesota-based corporation.

13.     Defendants are members of one of the largest health insurance conglomerates in the country (if not the largest), with several million members nationwide and hundreds of billions of dollars' worth of annual revenues.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over Defendants because Defendants regularly transact business in the State of New York, and because the wrongful conduct alleged in this Complaint occurred in New York.

15.     Venue is proper because NYU's principal place of business is located in New York County, and because a substantial part of the events and/or omissions giving rise to NYU's claims occurred in New York County.

16.     Venue is also proper because the Parties' contracts, as amended, dictate that any legal action or proceeding arising thereunder shall be commenced and maintained before a court of competent jurisdiction in New York County.

## FACTUAL BACKGROUND

### The 340B Drug Pricing Program

17.     Congress designed the 340B Drug Pricing Program (the "340B Program") to protect hospitals from escalating prescription drug prices – particularly hospitals, like NYU, which provide services to vulnerable, underserved communities.

18.     Codified at Section 340B of the Public Health Service Act (42 U.S.C. § 256(b)), the 340B Program allows participating hospitals to acquire certain prescription drugs from manufacturers at discounted rates, helping such hospitals stretch their scarce resources and provide

3

4887-6047-0703v.3

Case 1:24-cv-04803-PKC   Document 1-1   Filed 06/24/24   Page 7 of 71

comprehensive, critical care to large patient populations.

19.     As a participating hospital, NYU uses the savings achieved through the 340B Program to offset the significant cost of serving many low-income, uninsured, and/or underinsured patients, along with large volumes of Medicare and Medicaid beneficiaries.

**Prescription Drug Reimbursement Under the OPPS**

20.     The Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS").  For services rendered to beneficiaries of "original" Medicare (that is, *not* "Medicare Advantage" plans administered by private insurers (*see* ¶¶ 37-39, *infra*)), CMS reimburses hospitals according to the Outpatient Prospective Payment System (the "OPPS").

21.     The Medicare Act requires CMS to annually review and update the reimbursement rates for all items and services payable under the OPPS, including prescription drugs.  This process is subject to "notice-and-comment" rulemaking, during which CMS publishes its proposed reimbursement rates, solicits public input, and later promulgates final rules.

22.     CMS may fix OPPS prescription drug reimbursement rates in one of two ways.  First, CMS may conduct a survey of hospitals' "acquisition costs" for each covered drug, and set reimbursement rates based on the hospitals' average acquisition costs.  *See* 42 U.S.C. §1395*l*(t)(14)(A)(iii)(I).  Where CMS conducts such a survey, it may set different reimbursement rates for different "groups" of hospitals (that is, it may differentiate between hospitals participating in the 340B Program, on the one hand, and non-340B hospitals on the other).

23.     Second, if CMS does not conduct a survey of acquisition costs, it must set reimbursement rates based on the average sales price charged by drug manufacturers (subject to certain adjustments made by the Secretary of HHS).  Under this method, the statute fixes the

4

applicable reimbursement rate at 106% of the drug's average sales price. *See* 42 U.S.C. §1395*l*(t)(14)(A)(iii)(I). When using this method, CMS *cannot* vary reimbursement rates between 340B and non-340B hospitals.

**CMS Unlawfully Slashes 340B Reimbursement Rates**

24.     Until 2018, CMS uniformly set prescription drug reimbursement rates at approximately 106% of the drug's average sales price, and *never* set different reimbursement rates for 340B and non-340B hospitals.

25.     But in 2018 – despite failing to conduct a survey of hospitals' acquisition costs – CMS cut prescription drug reimbursement rates under the OPPS from 106% to 77.5% of the average sales price. This reduction applied *only* to 340B hospitals.

26.     CMS' actions prompted pushback from providers. The American Hospital Association (among other parties) filed a lawsuit against CMS, alleging CMS' rate reductions had unlawfully deprived 340B hospitals of approximately $1.6 billion in annual Medicare reimbursement payments.

27.     The District Court ruled in favor of the plaintiffs, concluding that CMS exceeded its statutory authority by cutting reimbursement rates for 340B hospitals without conducting the requisite survey of drug acquisition costs. The District Court remanded the issue to HHS to craft an appropriate remedy. *See Am. Hosp. Ass'n v. Azar*, 385 F.Supp.3d 1 (D.D.C. 2019) (addressing the appropriate remedy for CMS' unlawful rate reductions); *Am. Hosp. Ass'n v. Azar*, 348 F.Supp.3d 62 (D.D.C. 2018) (addressing the merits of plaintiffs' claims against CMS).

28.     On appeal, the D.C. Circuit reversed, holding that CMS had statutory authority to set different reimbursement rates for 340B and non-340B hospitals. *See Am. Hosp. Ass'n v. Azar*, 967 F.3d 818 (D.C. Cir. 2020).

4887-6047-0703v.3

29.     The U.S. Supreme Court granted certiorari, and *unanimously* reversed the D.C. Circuit.  In doing so, the Supreme Court held that, because CMS had not conducted a survey of acquisition costs, it was unlawful to vary prescription drug reimbursement rates between 340B and non-340B hospitals.  *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022).

30.     While the appeals were pending, CMS continued to apply its unlawful rate reductions to 340B hospitals – doing so between approximately January 1, 2018 and September 28, 2022.

31.     In the wake of the Supreme Court's unanimous decision, the case was remanded to the District Court.  On remand, the District vacated the rule by which CMS set reimbursement rates for calendar year 2022, effectively restoring the default reimbursement rate (106% of average sale price) on a going-forward basis.  *Am. Hosp. Ass'n v. Becerra*, 2022 WL 4534617 (D.D.C. Sep. 28, 2022).

**CMS Retroactively Adjusts Reimbursement Rates**
**and Issues Lump-Sum Payments to 340B Hospitals**

32.     Unfortunately, this outcome did nothing to remedy the billions of dollars' worth of underpayments to 340B hospitals between January 1, 2018 and September 28, 2022.  As a result, the District Court remanded the matter to HHS "to give the agency the opportunity to remediate its underpayments."  *Am. Hosp. Ass'n v. Becerra*, 2023 WL 143337, at *1 (D.D.C. Jan. 10, 2023).

33.     On November 8, 2023, CMS issued a Final Rule (CMS-1793-F) (the "Final Rule") establishing a methodology to compensate 340B hospitals for its unlawful rate reductions.  The Final Rule announced that CMS would make one-time, lump-sum payments to 340B hospitals equal to "the difference between what they were paid for 340B drugs" from 2018-2022 and "what they would have been paid had the [unlawful] 340B payment policy not applied."  Medicare Program; Hospital Outpatient Prospective Payment System: Remedy for the 340B-Acquired Drug

6

Payment Policy for Calendar Years 2018-2022, 88 Fed. Reg. 77,150.

34.     The Final Rule made clear that CMS was "adjust[ing] the prior payment rate" using its "retroactive rulemaking authority to implement the remedy by revising 340B payment rates for [2018-2022] to comply with the Supreme Court's interpretation of [the law]." *Id.* at 77,156.

35.     According to CMS, the Final Rule – which became effective January 8, 2024 – "can be viewed as a *retroactive adjustment* to the payment rates for each of 2018 through 2022," pursuant to CMS' retroactive rulemaking authority under 42 U.S.C. §1395hh(e)(1)(A).  *Id.* at 77,174 (emphasis added).

36.     Because CMS is required to implement rate adjustments in a budget-neutral manner, the Final Rule also announced that CMS would recoup its lump-sum remediation payments by cutting OPPS reimbursement rates for certain non-drug items and services by 0.5% per year.  The 0.5% rate reduction becomes effective January 1, 2026, and will continue until the lump-sum remediation payments are fully offset – which CMS estimates will take approximately sixteen (16) years.

**Medicare Advantage Organizations**

37.     The Medicare Advantage Program (also known as Medicare Part C) provides an alternative to original Medicare.  Under this program, private health insurers like Defendants – commonly referred to in this context as Medicare Advantage Organizations ("MAOs") – contract with CMS to offer benefit plans to Medicare-eligible beneficiaries.  *See generally* 42 U.S.C.1395w-21-22.

38.     MAOs receive a fixed monthly payment from CMS, the amount of which varies by location.  Each year, MAOs submit plan-specific bids which estimate the cost of providing original Medicare benefits in the specific counties served by the MAO.  CMS then compares those bids

7

against its pre-determined "benchmark" amounts (which also vary by location).  If an MAO's bid is less than the applicable benchmark amount, CMS pays the benchmark amount to the MAO, and the MAO retains the difference as a so-called "rebate" (subject to certain restrictions on how the rebate may be used).  Where an MAO's bid exceeds the applicable benchmark amount, the MAO may recover the shortfall by charging its enrollees a premium equal to the difference between its bid amount and the benchmark amount.  *See generally* 42 C.F.R. §§ 422.254, 422.304(a), 422.264(b)-(d), 422.266, 422.262(a)(2).

39.     MAOs also contract with healthcare providers, like NYU, to provide services to the MAOs' enrolled beneficiaries.  *See* 42 U.S.C. § 1395w-25(b)(4).  Among other terms, these contracts include a methodology for calculating reimbursement rates the MAOs will pay to the providers for covered services rendered to the MAO's members.  In many cases, these reimbursement rates are tied directly to the OPPS.

### NYU's Agreements with United and Oxford

40.     NYU participates in United's network under a certain Provider Agreement effective February 1, 1996, which agreement has been updated, amended, and extended from time to time (as amended, the "United Agreement").[2]

41.     NYU participates in Oxford's network under a Hospital Agreement effective October 1, 2003, which agreement has likewise been updated, amended, and extended from time to time (as amended, the "Oxford Agreement") (the United Agreement and Oxford Agreement are collectively referred to herein as the "Agreements").

42.     Under the Agreements, NYU provides covered items and health care services to

---

[2]      The original signatories to the United Agreement were NYU's, UHC's and UHC-NY's respective predecessors: New York University Medical Center, MetraHealth Insurance Company, and MetraHealth Care Plan of New York, Inc.

8

Defendants' insured members, in exchange for reimbursement at negotiated rates (which the Parties update from time to time).

43.     The United Agreement and Oxford Agreement are annexed hereto as Exhibits 1 and 2, respectively.  The Agreements and the reimbursement rates thereunder are subject to confidentiality provisions, and Exhibits 1 and 2 are therefore heavily redacted.  Upon request, NYU will furnish copies of the Agreements to the Court for *in camera* review and, at the appropriate time, will seek leave to file copies with the Court under seal.

44.     For NYU patients enrolled in Defendants' Medicare Advantage benefit plans, the applicable payment methodologies and reimbursement rates are set forth in a certain Facility Medicare Advantage Payer Appendix (the "MA Appendix") negotiated and agreed-upon by the Parties.  (The MA Appendix is annexed hereto as Exhibit 3 and, for the same reasons as Exhibits 1 and 2, is heavily redacted.)

45.     While CMS does not compel MAOs to adhere to any particular payment method in their provider agreements, Defendants have elected to use reimbursement rates/payment methodologies that are tied directly to the OPPS.

46.     Thus, under the MA Appendix, NYU's reimbursement rates for items and services provided to Defendants' Medicare Advantage members are based on a percentage of the OPPS, as determined annually by CMS.

47.     In pertinent part, Section 2.3.3 of the MA Appendix states as follows: "If CMS modifies the methodology used to calculate OPPS payments under original Medicare … [Defendants] will update [their] methodology used to calculate [NYU's] contract rate for services provided by [NYU] to [Defendants'] Medicare Advantage Customers *to be consistent with CMS's methodology*." (emphasis added).

9

4887-6047-0703v.3

48.     The MA Appendix also dictates that Defendants must update their payment methodology within forty five (45) days of CMS' modification – "[e]xcept, if the effective date is earlier than the date on which CMS places information regarding a modification in the public domain (for example, a *retroactive modification* or a change to a previously announced modification), [Defendants] will update [their] methodology within 45 days after the date on which CMS places that information in the public domain." (emphasis added).

**Defendants Refuse to Implement**
**Contractually-Mandated Rate Adjustments**

49.     As set forth above, CMS issued the Final Rule in November 2023. By its plain language, the Final Rule modified the OPPS methodology to include both retroactive adjustments to reimbursement rates *and* future lump-sum payments to 340B hospitals. *See also* 88 Fed. Reg. at 77,155 (referring to the "lump sum payment methodology"); 77,156 ("Methodology for Calculating and Process for Remitting Remedy Payments to Affected 340B Covered Entity Hospitals for 340B-Acquired Drugs Furnished and Paid Adjusted Amounts Under the OPPS in CY 2018 Through September 27th of CY 2022").

50.     Thus, in order to achieve consistency with CMS' methodology – as required by the Agreements – Defendants must retroactively adjust their own reimbursement rates under the MA Appendix *and* issue lump-sum payment to NYU.

51.     On or about March 16, 2023, NYU provided Defendants with a file identifying certain underpaid claims for 340B prescription drugs, and requested that Defendants reprocess and pay those claims at the appropriate reimbursement rates. Because CMS had not issued the Final Rule at that time, the March 16, 2023 file included only claims billed by NYU on or after September 28, 2022 (that is, the date on which the D.C. District Court vacated CMS' unlawful 340B reimbursement rates for calendar year 2022).

4887-6047-0703v.3

Case 1:24-cv-04803-PKC   Document 1-1   Filed 06/24/24   Page 14 of 71

52.     Defendants refused to reprocess any of the claims identified by NYU, asserting they were not bound the District Court and/or Supreme Court rulings.  In essence, Defendants took the position that they fully and properly reimbursed NYU using the *unlawful* OPPS payment methodology in place between January 1, 2018 and September 28, 2022.

53.     In the ensuing months, NYU and Defendants exchanged several communications detailing their respective positions.

54.     During this exchange, Defendants not only refused to remediate their contractual underpayments, but also confirmed they did not update their 340B payment methodology until December 2, 2022 – more than two months *after* the D.C. District Court vacated CMS' unlawful 2022 OPPS rates.  As a result, Defendants – by their own admission – continued to underpay NYU for 340B drugs through December 1, 2022.

55.     In the wake of the Final Rule – which made clear that CMS was retroactively updating its payment methodology for 340B drugs – NYU again sought to resolve this dispute through direct discussion with Defendants.

56.     Unfortunately, Defendants have refused to engage.  Instead, Defendants cling to the indefensible position that their 340B drug reimbursement rates were proper and that NYU was not underpaid between January 1, 2018 and December 2, 2022 – this despite Defendants' use of an *unlawful* payment methodology.

57.     Defendants' position plainly conflicts with the Agreements, which compel Defendants to update their payment methodology consistent with any modifications made by CMS – including retroactive modifications.

58.     In short, the Agreements require Defendants to follow CMS' payment methodologies to the letter.  By virtue of the Final Rule, CMS' payment methodologies now

11

include lump-sum payments to 340B hospitals like NYU – which are designed to offset nearly five years' worth of 340B drug underpayments stemming from *unlawful* rate reductions.

**Defendants Seek A Significant Windfall**

59.     Failure to make the lump-sum payments, as directed by CMS, will produce a windfall for Defendants on multiple fronts.

60.     As set forth above, beginning January 1, 2026 CMS will offset its lump-sum payments by reducing reimbursement rates for certain outpatient (non-drug) services by 0.5% each year.  CMS has estimated this rate reduction will remain in place for sixteen years.  Accordingly, because the MA Appendix is tied to CMS' payment methodologies, Defendants will pay NYU 0.5% less for certain non-drug services from 2026 until approximately 2042.

61.     But unlike CMS, Defendants never made the lump-sum 340B remediation payments.  In other words, Defendants seek the best of both worlds: pay NYU nothing now, *and* implement a sixteen-year rate reduction to offset payments it never made.  But the Agreements do not allow Defendants to cherry-pick the portions of CMS' payment methodologies it will follow.

## FIRST CAUSE OF ACTION

62.     NYU repeats and realleges the above allegations as if fully set forth herein.

63.     The Agreements (including the MA Appendix, which is fully incorporated into the Agreements) are valid and enforceable contracts between NYU and Defendants.

64.     Pursuant to the Agreements, NYU agreed to provide covered health care items and services to Defendants' insured members.  In return, Defendants agreed to reimburse NYU at the negotiated rates.

65.     At all relevant times, NYU has fully complied with its duties and obligations under the Agreements.

12

66.     Under the MA Appendix, Defendants must adhere to the reimbursement rates and payment methodologies promulgated by CMS.  In the event CMS modifies such reimbursement rates and/or payment methodologies – including retroactive modifications – Defendants must update their own methodologies to achieve consistency with CMS.

67.     Defendants have breached the Agreements by, *inter alia*, refusing to adhere to the reimbursement rates and payment methodologies promulgated by CMS.  Namely, Defendants have refused to comply with the Final Rule, which updated CMS' payment methodologies to include retroactive rate increases and lump-sum payments to 340B hospitals such as NYU.

68.     As a result, Defendants have underpaid NYU for certain prescription drugs provided to members of Defendants' Medicare Advantage plans between approximately January 1, 2018 and December 1, 2022.

69.     Defendants have also breached the covenant of good faith and fair dealing implied in the Agreements by, *inter alia*, refusing to adhere to the reimbursement rates and payment methodologies promulgated by CMS, and by using unlawful Medicare/OPPS reimbursement rates to calculate payments due to NYU.  In doing so, Defendants have deprived NYU of the benefit of the bargain under the Agreements.

70.     NYU timely notified Defendants of their breaches of the Agreements, but Defendants have refused to take any corrective action.

71.     By reason of the foregoing, NYU has been damaged in an amount to be determined at the trial of this matter, which amount is not less than approximately $4.3 million.

72.     Based on the above, NYU is entitled to recovery from Defendants in an amount to be determined at the trial of this matter, which amount is not less than approximately $4.3 million, plus interest thereon, plus costs, disbursements, and reasonable attorneys' fees.

13

## SECOND CAUSE OF ACTION

73.     NYU repeats and realleges the above allegations as if fully set forth herein.

74.     This cause of action is pled in the alternative, and only to the extent the Agreements do not cover the subject matter of this dispute.  This cause of action is based on Defendants' engagement in wrongful conduct, described above, which has generated a windfall for Defendants.

75.     By refusing to comply with the Final Rule, employing an unlawful reimbursement methodology, and refusing to remediate nearly five years' worth of underpayments for certain prescription drugs provided by NYU to members of Defendants' Medicare Advantage plans, Defendants have paid NYU substantially less than what NYU is entitled to receive for its services.

76.     As a result of these underpayments, Defendants have been unjustly enriched at NYU's expense.

77.     Under the circumstances described herein, it would be against equity and good conscience for the Court to permit Defendants to retain the difference between the (unlawful) rates Defendants paid NYU and the (lawful) rates NYU is entitled to receive under CMS' updated payment methodology set forth in the Final Rule.

78.     By reason of the foregoing, NYU has been damaged in an amount to be determined at the trial of this matter, which amount is not less than approximately $4.3 million.

79.     Based on the above, NYU is entitled to recovery from Defendants in an amount to be determined at the trial of this matter, which amount is not less than approximately $4.3 million, plus interest thereon, plus costs, disbursements, and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

80.     NYU repeats and realleges the above allegations as if fully set forth herein.

81.     This cause of action is pled in the alternative, and only to the extent the Agreements do not cover the subject matter of this dispute. This cause of action is based on the fact that NYU

14

4887-6047-0703v.3

provided certain outpatient prescription drugs to members of Defendants' Medicare Advantage benefit plans, and did so in good faith and at the behest of Defendants.

82. Defendants knowingly and voluntarily accepted the items and services provided by NYU, and Defendants knew that NYU reasonably expected to be paid for such items and services consistent with the reimbursement rates and methodologies promulgated by CMS.

83. Despite Defendants' acceptance of NYU's services, and despite NYU's reasonable expectation of payment according to the rates and methodologies promulgated by CMS, Defendants have refused to correct the underpayments identified herein.

84. By reason of the foregoing, NYU has been damaged in an amount to be determined at the trial of this matter, based on the fair and reasonable market value of the items and services provided, which amount is not less than approximately $4.3 million.

85. Based on the above, NYU is entitled to recover from Defendants, in *quantum meruit*, the fair and reasonable market value of items and services rendered to members of Defendants' Medicare Advantage Plans, in an amount to be determined at the trial of this matter, which amount is not less than approximately $4.3 million, plus interest thereon, plus costs, disbursements, and reasonable attorneys' fees.

**WHEREFORE**, NYU respectfully requests the following relief:

(a) On the First Cause of Action, damages in an amount to be determined at trial, which amount is not less than approximately $4.3 million, plus interest thereon, plus costs, disbursements, and reasonable attorneys' fees;

(b) On the Second Cause of Action, damages in an amount to be determined at trial, which amount is not less than approximately $4.3 million, plus interest thereon, plus costs, disbursements, and reasonable attorneys' fees;

(c) On the Third Cause of Action, damages in an amount to be determined at trial, which amount is based on the fair and reasonable market value of services rendered by NYU, and is not less than approximately $4.3 million, plus interest thereon, plus costs, disbursements, and reasonable attorneys' fees;

15

(d)    On all Causes of Action, statutory interest, plus costs, disbursements, and reasonable attorneys' fees; and

(e)    Such other and further relief as the Court may deem just and proper.

Dated: Great Neck, New York
       May 2, 2024

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiff NYU Langone Hospitals*

By:    _____/s/ Andrew L. Zwerling_____
       Andrew L. Zwerling
       Joshua M. Zarcone

111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200


TO:    UnitedHealthcare Insurance Company
       185 Asylum Street
       Hartford, Connecticut 06103.

TO:    UnitedHealthcare of New York, Inc.
       111 8th Avenue
       New York, New York 10011.

TO:    Oxford Health Plans (NY), Inc.
       One Penn Plaza, 8th Floor
       New York, New York 10119

16

# EXHIBIT 1

# The MetraHealth Provider Agreement

## New York University Medical Center



INDEX NO. 652324/2024
NYS

CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 05/06/2024 11:43 AM    INDEX NO. 652324/2024
NYS

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date executed by us below ("Effective Date").

**The MetraHealth Insurance Company and it's affiliates**

By: _R. Channing Wheeler_
R. Channing Wheeler
**Senior Vice President of Operations**

Effective Date: **February 1, 1996**

**New York University Medical Center**

By: _Theresa Bischoff_
Theresa Bischoff
**Executive Vice President & Deputy Provost**

Date: 1/22/96

**MetraHealth Care Plan of New York, Inc.**

By: _R. Channing Wheeler_
R. Channing Wheeler
**President**

Effective Date: **February 1, 1996**

**New York University Medical Center**

**550 First Avenue**

**New York, New York  10016**

**135562309**
**(TIN)**

CONFIDENTIAL

# EXHIBIT 2

For administrative ease and efficiency, Oxford has placed the Signature Page of this HOSPITAL
AGREEMENT at the front rather than at the back page of this document.

## OXFORD HEALTH PLANS (NY), INC.
## OXFORD HEALTH INSURANCE, INC.
## HOSPITAL AGREEMENT
## SIGNATURE PAGE

IN WITNESS WHEREOF, Hospital and Oxford Health Plans (NY), Inc.  and Oxford Health
Insurance, Inc. have executed this HOSPITAL AGREEMENT as set forth below.  This HOSPITAL
AGREEMENT shall be effective on October 1, 2003 (the "Effective Date")

NYU HOSPITALS CENTER

Signed: _____

Printed Name: John D. Catalano

Title: Senior Vice President

Date: 9/30/2003

OXFORD HEALTH PLANS (NY), INC.
OXFORD HEALTH INSURANCE, INC.

Signed: _____

Printed Name: EVP Healthcare Services

Title: Paul Conlin

Date: 10/22/03

OXFORDMASTERAGREEMENT_final                    I

Case 1:24-cv-04803-PKC   Document 1-1   Filed 06/24/24   Page 30 of 71









FILED: NEW YORK COUNTY CLERK 05/06/2024 11:43 AM

NYSCEF DOC. NO. 3

INDEX NO. 652324/2024

RECEIVED NYSCEF: 05/06/2024





FILED: NEW YORK COUNTY CLERK 05/06/2024 11:43 AM
INDEX NO. 652324/2024

NYSCEF DOC. NO. 3

Case 1:24-cv-04803-PKC   Document 1-1   Filed 06/24/24   Page 42 of 71

RECEIVED NYSCEF: 05/06/2024



INDEX NO. 652324/2024
Case 1:24-cv-04803-PKC   Document 1-1   Filed 06/24/24   Page 44 of 71
RECEIVED NYSCEF: 05/06/2024







Case 1:24-cv-04803-PKC   Document 1-1   Filed 06/24/24   Page 50 of 71



Case 1:24-cv-04803-PKC Document 1-1 Filed 06/24/24 Page 51 of 71





Case 1.24-cv-04803-PKC   Document 1-1   Filed 06/24/24   Page 55 of 71



INDEX NO. 652324/2024
RECEIVED NYSCEF: 05/06/2024

Case 1:24-cv-04803-PKC    Document 1-1    Filed 06/24/24    Page 57 of 71





# EXHIBIT 3

United Medicare 7/15/2011

# Facility Medicare Advantage Payer Appendix

**Facility Name(s):   NYU HOSPITALS CENTER, Tisch, Rusk Institute of Rehabilitation Medicine and Hospital for Joint Diseases**

Effective Date of this Appendix:  July 15, 2011

## APPLICABILITY

Unless another appendix to the Agreement applies specifically to a particular Benefit Plan that covers United Medicare Customers, the provisions of this Appendix apply to Covered Services rendered by Facility to United Medicare Customers enrolled in Medicare Advantage benefit plans.



INDEX NO. 652324/2024

(b)    Updates: If CMS modifies the methodology used to calculate OPPS payments under original Medicare (that is Medicare Part A and Part B) or the Medicare Advantage Program, United will update its methodology used to calculate Facility's contract rate for services provided by Facility to United Medicare Customers to be consistent with CMS' methodology. This update will occur as close to the CMS effective date as is reasonably possible, but in no case later than 45 days after the effective date of CMS' modification. Except, if the effective date is earlier than the date on which CMS places information regarding a modification in the public domain (for example, a retroactive modification or a change to a previously announced modification), United will update its methodology within 45 days after the date on which CMS places that information in the public domain.

INDEX NO. 652324/2024
RECEIVED NYSCEF: 05/06/2024