UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :

NYU LANGONE HOSPITALS,            :
                          :   Case No. 1:24-cv-04803-PKC

                 Plaintiff,   :

                          :

     -against-            :   Hon. P. Kevin Castel, U.S.D.J.

                          :

UNITEDHEALTHCARE INSURANCE  :
COMPANY, UNITEDHEALTHCARE OF NEW  :
YORK, INC., and OXFORD HEALTH PLANS  :
(NY), INC.,                   :

                          :

                Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

## PLAINTIFF NYU LANGONE HOSPITALS'
## MEMORANDUM OF LAW ON SUBJECT MATTER JURISDICTION

---

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiff*
111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200

Andrew L. Zwerling, Esq.
Joshua M. Zarcone, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 2

    The Parties .............................................................................................................. 2

    The 340B Drug Pricing Program ........................................................................... 2

    Prescription Drug Reimbursement Under the OPPS .............................................. 3

    CMS Unlawfully Slashes 340B Drug Reimbursement Rates ................................. 3

    CMS Retroactively Adjusts Reimbursement Rates and Issues Lump-Sum
    Payments to 340B Hospitals .................................................................................. 5

    Medicare Advantage Organizations ....................................................................... 6

    NYU's Agreements with United ............................................................................. 7

    Defendants Refuse to Correct Underpaid 340B Drug Claims ............................... 8

    Procedural History ................................................................................................. 9

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ..................................................................................................................... 11

POINT I

    THE COURT LACKS JURISDICTION OVER THIS STATE-LAW
    BREACH OF CONTRACT DISPUTE ................................................................. 11

    A.    The Purported Federal Issue Is Not "Necessarily Raised" .................... 12

    B.    The Purported Federal Issue Is Not "Actually Disputed" ..................... 16

    C.    The Purported Federal Issue Is Not "Substantial" ................................ 17

    D.    Exercising Jurisdiction Over NYU's Claim Would Disturb The
        Balance Of Federal And State Judicial Power ...................................... 19

i

4894-7181-0778v.3

POINT II

THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL
JURISDICTION OVER NYU'S SECOND AND THIRD CAUSES OF
ACTION ........................................................................................................................22

CONCLUSION...................................................................................................................23

4894-7181-0778v.3

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Hosp. Ass'n v. Azar*,
   348 F.Supp.3d 62 (D.D.C. 2018) ................................................................4

*Am. Hosp. Ass'n v. Azar*,
   385 F.Supp.3d 1 (D.D.C. 2019) ..................................................................4

*Am. Hosp. Ass'n v. Azar*,
   967 F.3d 818 (D.C. Cir. 2020) ...................................................................4

*Am. Hosp. Ass'n v. Becerra*,
   2022 WL 4534617 (D.D.C. Sep. 28, 2022) ...............................................5

*Am. Hosp. Ass'n v. Becerra*,
   2023 WL 143337 (D.D.C. Jan. 10, 2023) ..................................................5

*Am. Hosp. Ass'n v. Becerra*,
   596 U.S. 724 (2022).........................................................................4, 8, 16

*AMTAX Holdings 227, LLC v. CohnReznick LLP*,
   2024 WL 2866544 (S.D.N.Y. Jun. 4, 2024) ...................................... *passim*

*Ball v. Baker*,
   2022 WL 17808785 (S.D.N.Y. Dec. 18, 2022) .......................................21

*Blockbuster, Inc. v. Galeno*,
   472 F.3d 53 (2d Cir. 2006)........................................................................10

*Canandaigua Emer. Squad v. Rochester Area Health Maintenance Org., Inc.*,
   780 F.Supp.2d 313 (W.D.N.Y. 2011) .......................................................15

*Christus Health Gulf Coast v. Aetna, Inc*,
   237 S.W.3d 334-45 (Tex. 2007) ...............................................................15

*Combs v. Spring Creek Produce, LLC*,
   2017 WL 3687323 (E.D. Tenn. Aug. 25, 2017) .......................................12

*Corley v. Vance*,
   365 F.Supp.3d 407 (S.D.N.Y. 2019).........................................................23

*D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*,
   550 F.Supp.2d 481 (S.D.N.Y. 2008)..................................................15, 17

4894-7181-0778v.3

*Empire Healthchoice Assur., Inc. v. McVeigh,*
547 U.S. 677 (2006)..................................................................................15, 17, 20

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,*
545 U.S. 308 (2005)..................................................................................................10

*Gunn v. Minton,*
568 U.S. 251 (2013)..................................................................................10, 16, 18

*Hill v. Pikeville Med. Ctr., Inc.,*
2017 WL 690535 (E.D. Ken. Feb. 21, 2017)................................................. *passim*

*Jacobson v. Wells Fargo Nat'l Bank, N.A.,*
824 F.3d (2d Cir 2016)............................................................................................20

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
511 U.S. 375 (1994)..................................................................................................9

*Lupo v. Human Affairs Int'l, Inc.,*
28 F.3d 269 (2d Cir. 1994)........................................................................................9

*Merrell Dow Pharmaceuticals, Inc. v. Thompson,*
478 U.S. 804 (1986)..............................................................................................9, 10

*N.Y.C. Health & Hosps. Corp. v. WellCare of New York, Inc.,*
801 F.Supp.2d 126 (S.D.N.Y. 2011)......................................................................23

*N.Y.C. Health and Hosps. Corp. v. WellCare of N.Y., Inc.,*
769 F.Supp.2d 250 (S.D.N.Y. Jan. 7, 2011) .......................................10, 13, 18, 21

*NASDAQ OMG Grp., Inc. v. UBS Sec., LLC,*
770 F.3d 1010 (2d Cir 2014)...................................................................................10

*Phillips Pet. Co. v. Texaco, Inc.,*
415 U.S. 125 (1974)................................................................................................22

*Pritika v. Moore,*
91 F.Supp.3d 553 (S.D.N.Y. 2015) .............................................................17, 19, 20

*RenCare, Ltd v. Humana Health Plan of Texas, Inc.*
395 F.3d 555 (5th Cir. 2004) ..................................................................... *passim*

*Riseboro Comm. P'Ship Inc. v. SunAmerica Housing Fund No. 682,*
401 F.Supp.3d 367 (E.D.N.Y. 2019) ......................................................................20

*Tenet Healthsystem GB, Inc. v. Care Improvement Plus South Cent. Ins. Co.,*
875 F.3d 584 (11 Cir. 2017)...............................................................................15, 17

iv

*West Virginia v. Eli Lilly & Co.*
    476 F.Supp. 2d 230 (E.D.N.Y. Mar. 6, 2007)..........................................................................21

*Woodward Gov. Co. v. Curtis Wright Flight Sys., Inc.*,
    164 F.3d 123 (2d Cir. 1999).....................................................................................................22

**Statutes**

28 U.S.C. § 1331 .................................................................................................................9, 20, 21

28 U.S.C. § 1367(a) ........................................................................................................................9

28 U.S.C § 1441(a) .........................................................................................................................9

42 U.S.C.1395w .............................................................................................................................6

42 U.S.C. §1395hh(e)(1)(A) ..........................................................................................................5

42 U.S.C. §1395*l*(t)(14)(A)(iii)(I)...................................................................................................3

**Other Authorities**

42 C.F.R. § 422.254 .......................................................................................................................6

42 C.F.R. § 422.262 .......................................................................................................................6

42 C.F.R. § 422.264 .......................................................................................................................6

42 C.F.R. § 422.266 .......................................................................................................................6

42 C.F.R. § 422.304 .......................................................................................................................6

88 Fed. Reg. 77,150 .......................................................................................................................5

88 Fed. Reg. 77,155 .......................................................................................................................8

Plaintiff NYU Langone Hospitals ("NYU") respectfully submits this Memorandum of Law on the issue of subject matter jurisdiction, pursuant to the Court's directive and in response to the Notice of Removal filed by Defendants (collectively, "United") in this action.

## PRELIMINARY STATEMENT

To decide the jurisdictional issue before the Court, one need look no further than United's own words: "To be clear, this is a breach of contract case that will be determined by the interpretation of the parties' agreements."  ECF No. 1 (the "Notice of Removal"), ¶ 9.  On this one crucial point, it appears NYU and United have found agreement.

NYU's principal claim, for breach of contract, arises under a series of private agreements with United.  NYU's alternative theories of liability are equitable in nature and rooted entirely in state law.  Neither NYU nor United challenges the validity of any federal statute, rule, or regulation.  Likewise, NYU does not assert any right to relief under federal law, nor under a contract to which any federal agency is a party.  Further, there are no federal dollars at stake, and – because the parties' contracts are *sui generis* – the outcome of this litigation will affect only NYU and United.  To be sure, the operative contracts refer to a payment schedule promulgated by the federal government – but federal courts at every level, across the country, have held this insufficient to create a federal question.  Respectfully, this Court should follow their lead.  To do otherwise would upset the carefully-drawn balance between federal and state judicial responsibilities, and invite the removal of countless state-law claims.

At its core, this is a straightforward payment dispute involving the interpretation and application of a private contract.  Thus, the Court should remand this action to the state court in which it was filed.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### The Parties

NYU is a nationally-recognized, full-service, academic health system headquartered in Manhattan.  Through its broad network of hospital campuses and outpatient facilities, NYU provides comprehensive, science-driven care to its local communities, and is one of the most critical tertiary care providers in the greater New York City area.  *See* Complaint, ¶¶ 6-7. Because NYU serves large volumes of low-income, uninsured, and/or underinsured patients, along with many Medicare and Medicaid beneficiaries, NYU qualifies for participation in the federal 340B Drug Pricing Program (the "340B Program").  *See* id., ¶¶ 17-23.

Defendants are members of one of the largest (if not the largest) health insurance conglomerates in the country, with several million members nationwide and hundreds of billions of dollars' worth of annual revenues.  Defendants are affiliated through their common ownership by UnitedHealth Group, Inc., a Minnesota-based corporation.  *See* id., ¶¶ 8-13.

### The 340B Drug Pricing Program

The 340B Program is designed to protect eligible hospitals from escalating prescription drug prices – particularly hospitals like NYU, which provide services to vulnerable, underserved communities.  The 340B Program allows participating hospitals to acquire certain prescription drugs from manufacturers at discounted rates, enabling those hospitals to stretch their scarce resources and provide comprehensive, critical care to large patient populations.  NYU leverages the savings achieved through the 340B Program to offset the significant cost of serving many low-income, uninsured, and/or underinsured patients, along with large volumes of Medicare and Medicaid beneficiaries.  *See* id., ¶¶ 17-19.

---

[1] For a more complete recitation of the underlying factual history, NYU respectfully refers the Court to its Summons and Complaint filed in the Supreme Court of the State of New York, County of New York on May 6, 2024.  ECF No. 1-1 (the "Complaint").

**Prescription Drug Reimbursement Under the OPPS**

The Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS"). For services rendered to members of "original" Medicare (that is, *not* "Medicare Advantage" plans administered by private insurers (*see* Complaint, ¶¶ 37-39), CMS reimburses hospitals according to the Outpatient Prospective Payment System (the "OPPS"). CMS annually reviews and updates all OPPS reimbursement rates. This process is subject to "notice-and-comment" rulemaking, during which CMS publishes its proposed reimbursement rates and solicits public input before promulgating final rules. *See* id., ¶¶ 20-21.

For prescription drugs, federal law allows CMS to set OPPS reimbursement rates in one of two ways: (i) CMS may conduct a survey of hospitals' "acquisition costs" for each covered drug, and set reimbursement rates based on the average cost. *See* 42 U.S.C. §1395*l*(t)(14)(A)(iii)(I). Where CMS conducts such a survey, it may set different reimbursement rates for different "groups" of hospitals (that is, it may differentiate between 340B and non-340B hospitals); or (ii) If CMS does not survey acquisition costs, it must set reimbursement rates based on the average sales price charged by drug manufacturers. Under this method, the reimbursement rate fixed by statute is 106% of the drug's average sales price, and CMS *cannot* set different rates for 340B and non-340B hospitals. *See* 42 U.S.C. §1395*l*(t)(14)(A)(iii)(I); Complaint, ¶¶ 22-23.

**CMS Unlawfully Slashes 340B Drug Reimbursement Rates**

Until 2018, CMS uniformly set OPPS prescription drug reimbursement rates at approximately 106% of the drug's average sales price, and *never* set different reimbursement rates for 340B and non-340B hospitals. But in 2018 – without surveying hospitals' acquisition

costs – CMS abruptly cut those rates from 106% to 77.5% of the average sales price. This reduction applied *only* to 340B hospitals. *See* Complaint, ¶¶ 24-25.

Health care providers soon challenged CMS's actions. The American Hospital Association (among other parties) filed a lawsuit against CMS, alleging the rate reductions had unlawfully deprived 340B hospitals of approximately $1.6 billion in annual Medicare reimbursement payments. *See* id., ¶ 26. The District Court ruled in favor of the plaintiffs, concluding that CMS exceeded its statutory authority by cutting reimbursement rates for 340B hospitals without surveying acquisition costs. The District Court remanded the issue to HHS to craft an appropriate remedy. *See Am. Hosp. Ass'n v. Azar*, 385 F.Supp.3d 1 (D.D.C. 2019) (addressing the appropriate remedy for CMS's unlawful rate reductions); *Am. Hosp. Ass'n v. Azar*, 348 F.Supp.3d 62 (D.D.C. 2018) (addressing the merits of plaintiffs' claims against CMS); Complaint, ¶ 27.

On appeal, the D.C. Circuit reversed, holding that CMS had statutory authority to set different reimbursement rates for 340B and non-340B hospitals. *See Am. Hosp. Ass'n v. Azar*, 967 F.3d 818 (D.C. Cir. 2020); Complaint, ¶ 28. The U.S. Supreme Court granted certiorari, and *unanimously* reversed the D.C. Circuit. The Supreme Court held that, because CMS had not conducted a survey of acquisition costs, it lacked authority to set different reimbursement rates for 340B and non-340B hospitals, rendering those rates unlawful. *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022). *See* Complaint, ¶ 29.

While these appeals were pending, CMS continued to apply its unlawful rate reductions against 340B hospitals – doing so between approximately January 1, 2018 and September 28, 2022. *See* Complaint, ¶ 30. After its unanimous decision, the Supreme Court remanded the case to the District Court, which ultimately vacated the OPPS prescription drug reimbursement

rates for calendar year 2022 (thereby restoring the default reimbursement rate – 106% of average sales price – on a going-forward basis). *Am. Hosp. Ass'n v. Becerra*, 2022 WL 4534617 (D.D.C. Sep. 28, 2022). *See* Complaint, ¶ 31.

**CMS Retroactively Adjusts Reimbursement Rates
and Issues Lump-Sum Payments to 340B Hospitals**

But the District Court's "remedy" did not address the billions of dollars' worth of underpaid 340B drug claims between January 1, 2018 and September 28, 2022. As a result, the District Court remanded the matter to HHS "to give the agency the opportunity to remediate its underpayments." *Am. Hosp. Ass'n v. Becerra*, 2023 WL 143337, at *1 (D.D.C. Jan. 10, 2023). *See* Complaint, ¶ 32.

On November 8, 2023, CMS issued a Final Rule (CMS-1793-F) (the "Final Rule") setting forth a methodology to compensate 340B hospitals for nearly five years' worth of underpayments. The Final Rule announced that CMS would make one-time, lump-sum payments to 340B hospitals equal to "the difference between what they were paid for 340B drugs" from 2018-2022 and "what they would have been paid had the [unlawful] 340B payment policy not applied."[2] The Final Rule made clear that CMS was "adjust[ing] the prior payment rate" using its "retroactive rulemaking authority to implement the remedy by revising 340B payment rates for [2018-2022] to comply with the Supreme Court's interpretation of [the law]." *Id.* at 77,156. According to CMS, the Final Rule – which became effective January 8, 2024 – "can be viewed as a retroactive adjustment to the payment rates for each of 2018 through 2022," pursuant to CMS' retroactive rulemaking authority under 42 U.S.C. §1395hh(e)(1)(A). *Id.* at 77,174. *See* Complaint, ¶¶ 33-35.

---

[2]    Medicare Program; Hospital Outpatient Prospective Payment System: Remedy for the 340B-Acquired Drug Payment Policy for Calendar Years 2018-2022, 88 Fed. Reg. 77,150.

Because CMS has a statutory mandate to implement rate adjustments in a budget-neutral manner, the Final Rule also announced that CMS would recoup its lump-sum remediation payments by cutting OPPS reimbursement rates for certain non-drug items and services by 0.5% per year. The 0.5% rate reduction becomes effective January 1, 2026, and will continue until the lump-sum remediation payments are fully offset – which CMS estimates will take approximately sixteen (16) years. *See* id., ¶ 36.

**<u>Medicare Advantage Organizations</u>**

The Medicare Advantage Program (also known as Medicare Part C) provides an alternative to so-called original Medicare.[3] Under this program, private health insurers like Defendants – commonly referred to in this context as Medicare Advantage Organizations ("MAOs") – contract with CMS to offer benefit plans to Medicare-eligible beneficiaries. *See generally* 42 U.S.C.1395w-21-22. *See* Complaint, ¶¶ 37-39. After submitting annual bids, MAOs receive a fixed monthly payment from CMS, the amount of which varies by location. By accepting a flat-rate payment, MAOs assume the financial risk of providing Medicare benefits to their enrollees. In the event an MAO loses money, it may recover the shortfall *not* from the federal government, but by charging premiums to its enrollees. *See generally* 42 C.F.R. §§ 422.254, 422.304(a), 422.264(b)-(d), 422.266, 422.262(a)(2). *See* Complaint, ¶ 38.

MAOs commonly enter into private contracts with health care providers, like NYU, to provide services to their members. *See* 42 U.S.C. § 1395w-25(b)(4). Among other terms, these contracts include negotiated reimbursement rates for covered services – or, at the very least, a formula to calculate those rates. It is common for providers and MAOs to tie this formula directly to the OPPS. For example, a provider may agree to accept 100% (or some other

---

[3]     Original Medicare is also commonly referred to as Medicare Parts A and B.

negotiated percentage) of the prevailing OPPS rate for a particular service.  *See* Complaint, ¶¶ 39, 45-46.

**NYU's Agreements with United**

NYU participates in United's Medicare Advantage benefit plans under two separate agreements, both of which have been updated, amended, and extended from time to time (collectively, and as amended, the "Agreements").  *See* Complaint, ¶¶ 40-48.  Under the Agreements, NYU provides health care services to Defendants' insured members, in exchange for reimbursement at negotiated rates (which the parties also update from time to time).  For services rendered to Defendants' Medicare Advantage members, NYU is reimbursed according to a certain Facility Medicare Advantage Payer Appendix (the "MA Appendix") which the parties have negotiated and incorporated into the Agreements.  *See* id., ¶¶ 44-48.  CMS does not compel MAOs to use any particular payment method, and MAOs are free to negotiate payment terms directly with health care providers.  But here, Defendants have elected to use a payment method linked directly to the OPPS – which is common in payor-provider contracts nationwide. *See* id., ¶ 39.  As a result, when CMS updates its OPPS payment methodologies, Defendants must do the same.

Section 2.3.3 of the MA Appendix states as follows: "If CMS modifies the methodology used to calculate OPPS payments under original Medicare … [Defendants] will update [their] methodology used to calculate [NYU's] contract rate for services provided by [NYU] to [Defendants'] Medicare Advantage Customers *to be consistent with CMS's methodology*." (emphasis added).  The MA Appendix also compels Defendants to update their payment methodology within forty five (45) days of CMS's modification – "[e]xcept, if the effective date is earlier than the date on which CMS places information regarding a modification in the public

7

domain (for example, a *retroactive modification* or a change to a previously announced modification), [Defendants] will update [their] methodology within 45 days after the date on which CMS places that information in the public domain." (emphasis added).  *See* Complaint, ¶¶ 47-48.

### Defendants Refuse to Correct Underpaid 340B Drug Claims

CMS issued the Final Rule in November 2023, thereby modifying the OPPS methodology to include both retroactive increases *and* future lump-sum payments to 340B hospitals.[4]  *See* Complaint, ¶¶ 33-35.  In spite of the contractual requirement to maintain consistency with CMS's payment methodologies, Defendants have refused to retroactively adjust the 340B drug reimbursement rates under the MA Appendix *and* refused to issue lump-sum remediation payments to NYU.  Instead, Defendants assert they are not bound by the *Becerra* rulings nor by the Final Rule, and that they were at liberty to employ an *unlawful* payment methodology against NYU for nearly five years. *See* id., ¶¶ 49-58.

At the same time, Defendants plan to implement a 0.5% rate reduction on January 1, 2026 – a reduction that CMS estimates will last through 2041.  *See* id., ¶ 36.  But this rate reduction was designed to offset the lump-sum remediation payments issued by CMS to 340B hospitals – payments Defendants have never made. *See* id.  In essence, Defendants seek the best of both worlds: refuse to issue remediation payments, *and* implement a rate reduction to offset the cost of making those payments.

---

[4]     *See* 88 Fed. Reg. at 77,155 (referring to the "lump sum payment methodology"); 77,156 ("Methodology for Calculating and Process for Remitting Remedy Payments to Affected 340B Covered Entity Hospitals for 340B-Acquired Drugs Furnished and Paid Adjusted Amounts Under the OPPS in CY 2018 Through September 27th of CY 2022").

**Procedural History**

On May 6, 2024, NYU commenced this action in New York County Supreme Court, bringing claims for breach of contract and, alternatively, unjust enrichment and *quantum meruit*. On June 24, 2024, United removed the case to the U.S. District Court for the Southern District of New York, alleging federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367(a). During an Initial Pretrial Conference held July 29, 2024, the Court, *sua sponte*, ordered briefing on the issue of subject matter jurisdiction. NYU submits this brief in compliance with the Court's directive.

## LEGAL STANDARD

Federal courts have original jurisdiction over civil actions "arising under the Constitution laws, or treaties of the United States." 28 U.S.C. § 1331. As a corollary, 28 U.S.C § 1441(a) allows the removal to federal court of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." Nevertheless, it is hornbook law that federal courts are "courts of limited jurisdiction … [possessing] only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Because jurisdictional questions involve "sensitive judgments about congressional intent, judicial power, and the federal system," the Supreme Court has "forcefully reiterated [the] need for prudence and restraint in the jurisdictional inquiry." *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 810 (1986) (citing *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 20 (1983)). Thus, "in light of the congressional intent to restrict federal court jurisdiction … federal courts construe the removal statute narrowly, resolving any doubts against removability." *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994). Moreover, "[i]t is well-settled that the party asserting federal

9

jurisdiction [United, in this case] bears the burden of establishing jurisdiction [.]" *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006). Where the responsible party fails to carry that burden by "competent proof," the district court must remand the case to the court in which it was originally filed. *N.Y.C. Health and Hosps. Corp. v. WellCare of N.Y., Inc.*, 769 F.Supp.2d 250, 254 (S.D.N.Y. Jan. 7, 2011) (citing *Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*, 2003 WL 22283814 (S.D.N.Y. Oct. 2, 2003); *R.G. Barry Corp v. Mushroom Makers, Inc.*, 612 F.2d 651, 655 (2d Cir 1979)).

Where, as here, the complaint pleads only state law causes of action, "federal jurisdiction may still exist in a 'special and small category of cases,' namely, those that 'implicate significant federal issues.'" *AMTAX Holdings 227, LLC v. CohnReznick LLP*, 2024 WL 2866544 (S.D.N.Y. Jun. 4, 2024) (appeal pending, No. 24-1726 (docketed June 28, 2024) (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006); *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) (internal quotation marks and citations omitted)). The Supreme Court has promulgated a four-part test to determine whether federal question jurisdiction exists under these circumstances. The party asserting jurisdiction must establish that a federal issue is (1) necessarily raised; (2) actually disputed; (3) substantial; and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." (the "Grable Test") *Grable*, 545 U.S. at 314; *Gunn v. Minton*, 568 U.S. 251, 257 (2013). Because this is *not* a balancing test, jurisdiction lies only "where all four of these requirements are met." *Gunn*, 568 U.S. at 258. This is an exceedingly restrictive standard, and "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merell Dow*, 478 U.S. at 813. *See also NASDAQ OMG Grp., Inc.*

10

*v. UBS Sec., LLC*, 770 F.3d 1010, 1019 (2d Cir 2014) ("The Supreme Court has been sparing in recognizing state law claims fitting this criterion.").

For the reasons below, United cannot carry its burden on *any* of the four factors in the Grable Test, and the Court should remand this action to New York County Supreme Court.

## ARGUMENT

### POINT I

### THE COURT LACKS JURISDICTION OVER THIS STATE-LAW BREACH OF CONTRACT DISPUTE

United contends that NYU's breach of contract claim raises a federal question. *See* Notice of Removal, ¶¶ 11-27. But United's position rests on the false premise that, in order to prevail, NYU "must prove that United violated Medicare rules and regulations." Id. at ¶ 19. In reality, Medicare rules and regulations merely provide a formula to calculate what NYU is owed under the Agreements. *See* Complaint, ¶¶ 44-48. Thus, in order to prevail on its claim, NYU need only prove that United breached the Agreements by failing to honor the negotiated reimbursement rates. The mere fact that such rates are tied to a federal benchmark does not transform a straightforward, state-law breach of contract claim into a federal question. *See, e.g.*, *Hill v. Pikeville Med. Ctr., Inc.*, 2017 WL 690535, at *4 (E.D. Ken. Feb. 21, 2017) ("Were the Court to keep this case simply because [plaintiff's] contract mentions WRVUs[5], then any contract tying compensation to that national benchmark would all of a sudden raise a federal issue. And not only that: by the same logic, *any* contract tying compensation to *any* national

---

[5]     "WRVUs" refers to "Work Relative Value Units." WRVUs are a federally-defined metric used to measure physician productivity and to set reimbursement rates for medical procedures covered by government-funded health care programs like Medicare.

benchmark (like the Consumer Price Index)[6] would become federalized, too.  That would mark a 'dramatic shift' in the balance of state and federal judicial power.") (emphasis in original); *Combs v. Spring Creek Produce, LLC*, 2017 WL 3687323, at *3 (E.D. Tenn. Aug. 25, 2017) (citing *Hill*, remanding to state court, and finding that "simply using terms that are defined by federal law does not equate to the Plaintiff alleging a violation of federal law.").

## A.    The Purported Federal Issue Is Not "Necessarily Raised"

To meet the first prong of the Grable Test, United must establish that NYU's right to relief "necessarily depends on resolution of a … question of federal law."  *AMTAX Holdings*, 2024 WL 2866544, at *8 (quoting *Empire Healthchoice Assurance*, 547 U.S. at 690)).  That is, "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action."  *AMTAX Holdings*, 2024 WL 2866544, at *8 (quoting *Tantaros v. Fox News Network, LLC*, 12 F.4th 135, 141 (2d Cir. 2021)).

United's Notice of Removal repeatedly mischaracterizes NYU's claim to manufacture a federal question.  But the Complaint is clear that NYU's right to relief is a creature of contract, which turns largely on the following language from the MA Appendix incorporated into the Agreements: "If CMS modifies the methodology used to calculate OPPS payments under original Medicare, [Defendants] will update [their] methodology used to calculate [NYU's] contract rate for services provided by [NYU] to [Defendants'] Medicare Advantage Customers to be consistent with CMS's methodology."  Complaint, ¶ 47.  Neither NYU nor United challenges the validity of the Final Rule, nor does NYU claim a right to payment arising thereunder. Instead, NYU merely asserts the Final Rule triggered United's *contractual* obligation to implement new reimbursement rates under the Agreements.  A court need not resolve any

---

[6]    The Court referenced this very same "Consumer Price Index" analogy during the Initial Pretrial Conference.

question of federal law to determine whether the Agreements imposed such an obligation on United, nor to determine whether United complied. In fact, CMS itself has made crystal clear that Medicare rules and regulations have no place in such contractual disputes:

> CMS may not require MAOs to contract with a particular healthcare provider or use particular pricing structures with their contracted providers. Therefore, MAOs that contract with a provider or facility for eligible 340B drugs can negotiate the terms and conditions of payment directly with the provider or facility and CMS cannot interfere in the payment rates that MAOs set in contracts with providers and facilities.[7]

United relies primarily on *N.Y.C. Health & Hosps. Corp. v. WellCare of N.Y., Inc.*, 769 F.Supp.2d 250 (S.D.N.Y. 2011) ("*WellCare*"). But United ignores the crucial distinguishing factor in that case: unlike NYU, the plaintiff in *WellCare* was an *out-of-network* (or "non-contracted") provider. As such, there was no contract – and no negotiated reimbursement rates or agreed-upon payment formula – between the plaintiff health care provider and defendant health insurer. *See WellCare*, 769 F.Supp.2d at 258 ("[T]he parties here *had no contractual relationship* and reimbursement is [therefore] governed by a complex federal regulatory scheme.") (emphasis added). Instead, the *WellCare* plaintiff claimed third-party beneficiary status under a contract between the *defendant and CMS*, and alleged that defendant "breached its contract with CMS by failing to pay … [plaintiff] according to the terms and conditions required by Medicare laws and regulations." *WellCare*, 769 F.Supp.2d at 256. In other words, the *WellCare* plaintiff asserted a right to payment arising *not* under a private contract with the defendant, but under a contract with CMS *and* under certain Medicare regulations incorporated by reference therein. Thus, the *WellCare* defendant's alleged violation of federal law was an essential (if not dispositive) element of the plaintiff's cause of action. *See* id. By contrast, NYU

---

[7]     Hospital Outpatient Prospective Payment System Update on Payment Rates for Drugs Acquired through the 340B Program – Informational for MAOs (December 20, 2022). https://www.cms.gov/files/document/cmsopps340bupdate508g.pdf

is in-network (or "contracted") with United, its right to relief arises under two private agreements, and United's breach is not contingent upon a violation of federal law. (Indeed, United could be both fully compliant with federal law *and* in breach of the Agreements.)

Under United's jurisdictional theory, *any* dispute involving mere reference to a CMS fee schedule – or any federal benchmark – necessarily raises a federal question. Surely, this is not the case. *See Hill*, 2017 WL 690535, at *4 ("[Plaintiff] has merely pled claims relating to a contact that references a unit of measurement (WRVUs) that a federal agency happens to promulgate. To resolve any claims involving WRVUs – if the litigation even gets that far – a court would not need to answer a substantial question of federal law.").

In *RenCare, Ltd v. Humana Health Plan of Texas, Inc.*, the Fifth Circuit confronted the exact circumstances present here: a payment dispute involving an MAO and an in-network (or "contracted") provider. 395 F.3d 555 (5th Cir. 2004). The court found no federal question, both because of the contractual relationship between the parties and because of the method by which MAOs administer benefits. Specifically, the *RenCare* court noted that "the government has no financial interest in the present case because it pays Humana a flat rate each month for Humana's services to [Medicare Advantage] enrollees, regardless of the services it renders to [those] enrollees. Irrespective of who ultimately prevails, the government will not receive or pay out funds. The dispute is solely between Humana and RenCare and is based on the parties' privately-agreed-to payment plan." *RenCare*, 395 F.3d at 558. The court went on to explain that, under the Medicare Advantage program, the insurer assumes all financial risk and "bears the ultimate responsibility for providing services to its [Medicare Advantage] enrollees. It has chosen to fulfill its obligations by contracting [health care providers] to provide services to

14

enrollees.  With the government's risk extinguished … [the provider's] claims are claims for payment pursuant to a contract between private parties."  Id.at 559.

As in *RenCare*, there are no federal dollars at stake here, the government's risk has been extinguished by United, and – at bottom – this is a payment dispute between parties to a private contract.  Such disputes simply do not create a federal question.[8]  *See, e.g.*, *Empire Healthchoice Assur.*, 547 U.S. at 677, 680 (finding no federal jurisdiction over claim purportedly arising under Federal Employees Health Benefits Act of 1959 ("FEHBA"), because FEHBA did not encompass "contract-based reimbursement claims") ("[Plaintiff's] contract-derived reimbursement claim is not a creature of federal law.") (internal quotation marks and citations omitted); *Tenet Healthsystem GB, Inc. v. Care Improvement Plus South Cent. Ins. Co.*, 875 F.3d 584, 591 (11 Cir. 2017) ("As the *RenCare* court noted, the Medicare Act explicitly allows contract providers and MAOs to define the terms of their own agreements without reference to Medicare regulations.  A contract provider's claims are determined entirely by reference to the written contract, not the Medicare Act.") (citations omitted); *AMTAX Holdings*, 2024 WL 2866544, at *8-9 (finding no federal question, even where claims implicated a federal statute, because the plaintiff's right to relief ultimately arose under a contract); *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*, 550 F.Supp.2d 481, 487 (S.D.N.Y. 2008) (finding no federal question, even though plaintiff's claim required interpretation of federal statute, because the core issue was state-law breach of contract, and any federal issue was merely

---

[8]    The existence of a contract between NYU and United is not disputed.  Nevertheless, courts have found no federal question even in payment disputes involving non-contract providers.  *See Canandaigua Emer. Squad v. Rochester Area Health Maintenance Org., Inc.*, 780 F.Supp.2d 313, 320-21 (W.D.N.Y. 2011) ("[N]either the government nor the recipients of the [health care] services have any interest in the outcome.  No Medicare recipient has been, or could be, denied [health care] services as a result of the outcome of this case, and no governments funds are at stake.  That the parties had no written contract is simply immaterial."); *Christus Health Gulf Coast v. Aetna, Inc*, 237 S.W.3d 334-45 (Tex. 2007) (noting it was not "dispositive that there apparently was no contract directly between [the MAO] and the Hospitals.").

ancillary) ("The Supreme Court has made clear, however, that the mere invocation of a 'federal issue' cannot serve as a 'password opening federal courts to any state action embracing a point of federal law.'") (quoting *Grable*, 545 U.S. at 314); *Hill*, 2017 WL 690535, at \*2 (finding no federal question in breach of contract case) ("[Plaintiff's] contract entitles him to payment according to a fee schedule that [CMS] set via regulation … [and Defendant] is obliged to pay [Plaintiff] on these terms because that is what it contracted to do.  Because state law governs that contract, [Plaintiff's] cause of action to enforce its terms arises under state – not federal – law.").

For all of these reasons, the Court should find that NYU's claim does not "necessarily raise" a federal question.  On this ground alone, the case is ripe for remand to state court.

**B.    The Purported Federal Issue Is Not "Actually Disputed"**

The second prong of the Grable Test requires a showing that the federal issue is "the central point of dispute between the parties."  *Gunn*, 568 U.S. at 258.  Here, United again relies on the false premise that NYU's claims are predicated on a violation of federal law, rather than a mere breach of contract.  *See* Notice of Removal, ¶ 20.  But this position fails for all of the reasons in Point I.A, *supra*.  Specifically, NYU does not allege a right to payment arising under the Final Rule (or under any federal law, for that matter).  Rather, NYU asserts the Final Rule triggered a contractual duty on the part of United, and United failed to comply with that duty.  A court need not assess the validity of the Final Rule, nor the extent of United's compliance with any federal law, to determine NYU's entitlement to relief.

Making matters worse, United attempts to turn the jurisdictional inquiry on its head – namely by alleging that its *defense* is sufficient to place a federal issue in dispute.  *See* Notice of Removal, ¶ 20 ("United disputes that *Becerra*[9] applies or that it was obligated to comply with CMS's Final Rule.").   But the Court's inquiry "must be unaided by anything alleged in

---

[9]    *Becerra* refers to *Am. Hosp. Assoc. v. Becerra*, 596 U.S. 724 (2022).

16

anticipation or avoidance of defenses which it is thought the defendant may interpose … even if both parties admit that the defense is the only question truly at issue in the case." *AMTAX Holdings*, 2024 WL 2866544, at *8 (quoting *Tantaros*, 12 F.4th at 141-42).   Stated differently, the mere assertion of a defense grounded in federal law does not create a federal question – even where the validity of that defense is potentially dispositive.

In short, NYU asserts no federal claim, and the parties neither challenge nor assert any rights arising under federal law.  Instead, the parties dispute United's compliance with payment obligations under a private contract governed by state law.  Merely tying those payment obligations to a formula promulgated by a federal agency does not create a federal question. *See, e.g.*, *RenCare*, 395 F.3d at 555; *Empire Healthchoice Assur.*, 547 U.S. at 680; *Tenet Healthsystem*, 875 F.3d at 591 (citing *RenCare*); *AMTAX Holdings*, 2024 WL 2866544, at *8-9; *D.B. Zwirn Special Opportunities Fund,* 550 F.Supp.2d at 487; *Hill*, 2017 WL 690535, at *2 (all holding no federal question where plaintiff's ultimate right to relief was contract-based).

For all of these reasons – assuming it reaches this second prong of the Grable Test – the Court should find that no federal issue is "actually disputed."

## C.    **The Purported Federal Issue Is Not "Substantial"**

This third factor of the Grable Test requires a showing that "the federal issue is 'important … to the federal system as a whole.  It is not enough that the federal issue be significant to the particular parties in the immediate suit.'"   *AMTAX Holdings*, 2024 WL 2866544 (quoting *Gunn*, 568 U.S. at 260) (citations omitted).  Given this high standard, "courts have typically found a substantial federal issue only in those exceptional cases that go beyond the application of some federal legal standard to private litigants' state law claims, and instead implicate broad consequences to the federal system or the nation as a whole." *Pritika v. Moore*,

17

91 F.Supp.3d 553, 558 (S.D.N.Y. 2015).  On the other hand, cases that are "fact-bound and situation-specific" – such as cases involving the administration of private contracts – "are not sufficient to establish federal [question] jurisdiction."  *Gunn*, 568 U.S. at 263.

NYU's claim does not, as United suggests, "implicate[ ] the complex reimbursement schemes created by Medicare law" – namely because NYU does not seek payment under any Medicare rule or regulation. Notice of Removal, ¶ 22.  Instead, NYU seeks payment under a series of contracts, and its claim therefore implicates only the "privately-agreed-to payment plan" between NYU and United.  *RenCare*, 395 F.3d at 558.  Here, United again relies principally on *WellCare* for the (false) proposition that "the eventual outcome of this litigation could potentially affect the hundreds of [MAOs] that have *contracted with CMS* [.]"  Notice of Removal, ¶ 22 (quoting *WellCare*, 769 F.Supp.2d at 257) (emphasis added).  But again, United ignores that the operative contract here is not between United and CMS – as was the case in *WellCare* – but between United and NYU.  NYU's status as an "in-network" (or "contracted") provider eviscerates any comparison to *WellCare*, along with any suggestion that NYU's claim arises under Medicare rules and regulations.  Even the *WellCare* court recognized the vast difference between "contracted" and "non-contracted" providers when it took great pains to distinguish the *RenCare* case.  *See WellCare*, 769 F.Supp.2d at 258 ("*RenCare* involved a payment dispute between a [MAO] and a Contracted Provider, wherein the Contracted Provider sued in Texas state court for breach of contract … the *RenCare* court emphasized that contracts between [MAOs] and Contracted Providers are subject to very few restrictions, and that the contracting providers can generally negotiate their own terms.  By contrast, the parties here *had no contractual relationship* and reimbursement is [therefore] governed by a complex federal regulatory scheme.") (emphasis added).

Because this case hinges on the interpretation of a private contract, it raises no issue "that could be settled once and for all and thereafter would govern numerous similar cases." Notice of Removal, ¶ 21 (citing *Tantaros*, 12 F.4th at 145). The Agreements between NYU and United are *sui generis*, and the outcome of this case will have few – if any – ramifications for other cases involving standalone contracts between other MAOs and health care providers. *See, e.g.*, *AMTAX Holdings*, 2024 WL 2866544, at *11 (finding no substantial federal question where the dispute involved "the parties' interpretation of a *sui generis* contract"); *Pritika v. Moore*, 91 F.Supp.3d at 559 ([T]his case involves, at best, the application of a federal legal standard to private litigants' state law claims. It will not have broad consequences to the federal system or the nation as a whole."); *Hill*, 2017 WL 690535, at *3 (finding no substantial federal question in contract dispute involving application of a federal standard) ("To address the questions of fact and state law presented here, a court will possibly need to refer to a federal regulation. But it will not need to resolve any substantial issue of federal law … [because] these questions are too 'fact-bound and situation-specific' to affect any other cases; by answering them, the court will affect only [Defendant's] contractual duties to [Plaintiff].") (citing *Empire Healthchoice Assur.*, 547 U.S. at 701) (finding no substantial federal question because plaintiff's contract-based reimbursement claim was "fact-bound and situation-specific").

For all of these reasons, the Court should find that – to the extent any federal issue is raised and/or disputed, which NYU denies – that issue is not "substantial."

**D.    Exercising Jurisdiction Over NYU's Claim Would
Disturb The Balance Of Federal And State Judicial Power**

Under this final prong of the Grable Test, the Court should consider (i) any impact on the volume of federal court litigation if jurisdiction is accepted, and (ii) the possibility of causing a

significant shift of what were traditionally state cases into federal cases.  *See Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d, 308, 316 (2d Cir 2016).

Undoubtedly, private contract disputes are traditionally state cases.  But in United's view, mere reference to a federally-defined benchmark produces a federal question.   If accepted, United's theory will "trigger a voluminous amount of cases [and] transform state court litigation of traditional breach of contract actions … into federal litigation."  *Riseboro Comm. P'Ship Inc. v. SunAmerica Housing Fund No. 682*, 401 F.Supp.3d 367, 376 (E.D.N.Y. 2019).  This concern is particularly acute in disputes between health insurers and in-network (or "contracted") health care providers, where payment formulas are commonly linked to fee schedules promulgated by CMS.  *See* Complaint, ¶¶ 39, 45-48.  In United's view, all such disputes now belong in federal court.  But courts across the country have consistently – and emphatically – cautioned against such an expansive interpretation of 28 U.S.C § 1331.  *See, e.g.*, *Empire Healthchoice Assur.*, 547 U.S. at 701 (holding no federal jurisdiction over a contract-based reimbursement dispute, and noting "it is hardly apparent why a proper federal-state balance would place such a nonstatutory issue under the complete governance of federal law, to be declared in a federal forum."); *AMTAX Holdings*, 2024 WL 2866544, at *11 (finding no federal jurisdiction where it would "open the floodgates for the filing of [state law] claims in federal court … [and] would clearly disrupt the appropriate balance of federal and state judicial responsibilities."); *Pritika v. Moore*, 91 F.Supp.2d 553, 559 ("The missing [federal] cause of action is seen not as a missing federal door key, always required, but as a missing welcome mat, required … when exercising federal jurisdiction over a state claim would … attract[ ] a horde of original filings and removal cases raising other state claims with embedded federal issues.") (quoting *Merell Dow*, 478 U.S. at 810) (internal quotation marks omitted); *Hill*, 2017 WL 690535, at *4 ("Where 'the bulk of judicial

20

business in the United States in [an] area is conducted by state courts,' federal courts must be careful not to vacuum those cases up.  The state courts conduct the bulk of the nation's contract law.  Were the Court to keep this case … then any contract tying compensation to [a] national benchmark would all of a sudden raise a federal issue … [but] *parties do not establish federal jurisdiction simply through referring to a federally promulgated payment schedule in their contracts*.") (emphasis added) (quoting *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 553 (6th Cir. 2006) ("This balance would be upset drastically if state public policy claims could be converted into federal actions by the simple expedient of referencing federal law as the source of that public policy.  We believe such a dramatic shift would distort the division of judicial labor assumed by Congress under section 1331.")).

United cites a purported "interest in the uniform application of federal law governing the Medicare program."  Notice of Removal, ¶ 24 (quoting *Ball v. Baker*, 2022 WL 17808785, at *5 (S.D.N.Y. Dec. 18, 2022)).  But this interest is entirely misplaced – as is United's reliance on *Ball*, which involved alleged violations of two federal statutes resulting in millions of dollars' worth of potentially-illegitimate Medicare expenditures by the federal government.  *See Ball*, 2022 WL 17808785, at *1.  Unlike here, *Ball* did not involve a private contract, and the viability of the plaintiff's claims hinged entirely on whether defendants violated the federal Anti-Kickback Statute and federal False Claims Act.  *Id.*, at *4.  *West Virginia v. Eli Lilly & Co.* is similarly inapposite, namely because – like *WellCare*, *Ball*, and seemingly every case United relies on – it *did not* involve a contract between private parties.  476 F.Supp. 2d 230 (E.D.N.Y. Mar. 6, 2007).  Instead, *West Virginia* involved claims arising from federally-mandated prescription drug coverage, and the direct expenditure of federal Medicaid funds.  *See id.* at 233. By stark contrast, this case is governed by a series of private contracts between NYU and United,

not by federal regulations. Moreover, no federal money is at issue here – because United, in its capacity as an MAO, accepted a flat-rate payment and thereby extinguished the federal government's financial stake. *See* Point I.A, *supra* (citing *RenCare*, 395 F.3d at 558-59).

On these facts, there is no federal interest in what amounts to a private, contract-based payment dispute between NYU and United. *See Woodward Gov. Co. v. Curtis Wright Flight Sys., Inc.*, 164 F.3d 123, 127-129 (2d Cir. 1999) (finding no federal question in a "garden variety breach of contract case"). Nor is there any interest in "national uniformity," given that NYU's rights arise under a series of standalone, *sui generis* contracts – not under a federal regulatory scheme. *See* Notice of Removal, ¶ 26 (citing *WellCare*, 769 F.Supp. at 259 (finding a federal question where the plaintiff – an out-of-network health care provider with no contractual relationship to the defendant – asserted a right to payment arising under Medicare rules and regulations)).

For all of the reasons set forth in Points I.A-D, *supra*, the Court should find that United cannot carry its burden under the Grable Test, and remand this action to state court.

### POINT II

### THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER NYU'S SECOND AND THIRD CAUSES OF ACTION

NYU's Second and Third Causes of Action are for unjust enrichment and *quantum meruit*, respectively. *See* Complaint, ¶¶ 73-85. Both claims are grounded in state law, and offer no independent basis for federal jurisdiction. *See Phillips Pet. Co. v. Texaco, Inc.*, 415 U.S. 125, 129 (1974) ("Texaco's suit … is, in effect, an action in *quantum meruit*, whose source is state law and not federal law."); *Woodward Gov. Co.*, 164 F.3d at 130 (ruling that quasi-contract claim did not invoke federal law). Thus, assuming the Court finds no subject matter jurisdiction

over NYU's breach of contract claim – as NYU contends it should – the Court should decline to exercise supplemental jurisdiction over the remaining claims. *See, e.g.*, *Corley v. Vance*, 365 F.Supp.3d 407, 462-63 (S.D.N.Y. 2019) (declining to exercise supplemental jurisdiction) ("[G]iven that only state-law issues remain in this case, comity dictates that the Court decline to decide those disputes.") (citing *Bray v. City of N.Y.*, 365 F.Supp.2d 277, 287 (S.D.N.Y. 2004) (declining to exercise supplemental jurisdiction over state claims despite federal defenses)); *N.Y.C. Health & Hosps. Corp. v. WellCare of New York, Inc.*, 801 F.Supp.2d 126, 142 (S.D.N.Y. 2011) (remanding unjust enrichment claim to state court).

## **CONCLUSION**

For all of the foregoing reasons, NYU respectfully requests that the Court issue an Order remanding this action to New York County Supreme Court, and granting such other and further relief as the Court may deem just, equitable, or proper.

Dated: August 29, 2024

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiff NYU Langone Hospitals*


By: _____*/s/ Joshua M. Zarcone*_____
　　　　　Andrew L. Zwerling
　　　　　Joshua M. Zarcone
111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200

23